*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

DARIUS MARQUIS THOMAS,

       Defendant-Appellant.

UNPUBLISHED
August 17, 2023

No. 359025
Wayne Circuit Court
LC No. 19-009890-01-FC

Before: REDFORD, P.J., and K. F. KELLY and RICK, JJ.

PER CURIAM.

Defendant appeals as of right his jury-trial convictions of second-degree murder, MCL 750.317;[1] two counts of assault with intent to commit murder (AWIM), MCL 750.83; carrying a concealed weapon (CCW), MCL 750.227; and three counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Defendant was sentenced to 22 to 40 years' imprisonment for his second-degree murder conviction, 5 to 20 years' imprisonment for each of his AWIM convictions, one to five years' imprisonment for his CCW conviction, and two years' imprisonment for each of his felony-firearm convictions. We affirm.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This case arises out of a shooting that occurred in the early morning hours of November 23, 2019. Defendant and his girlfriend, Ariel Roberts, got into an argument at a bar where they had gone to celebrate Roberts's birthday. Roberts's cousin, Joey Washington, drove defendant, Roberts, and a friend named Zacchaeus Odom home from the bar in his truck, a black Ford F-150. On the way home, Washington asked if anyone wanted to stop at Coney Island for food. Defendant agreed, but Roberts told Washington that she would rather go directly home. An argument ensued, primarily between defendant and Washington, who began driving toward Roberts's home when

---

[1] Defendant was charged and tried on a count of first-degree premeditated murder, MCL 750.316(1)(a), but was acquitted of that charge and convicted of the lesser included offense of second-degree murder.

she said she was uninterested in getting food. Defendant became upset and started acting aggressively. Washington slowed down while they were driving down a side street and defendant exited the truck. He then fired a gun toward the vehicle. One of the bullets shattered the rear window of the truck and struck Odom's head, causing his death. Washington and Roberts were not injured.

Washington drove away when the shooting occurred, but Roberts could not recall where they went because her head was under the dashboard out of fear. Roberts recalled Washington stopping the vehicle, hearing doors opening and closing, and Washington continuing to drive. Because her head was down for the remainder of the drive, Roberts did not realize Odom was no longer in the car until they reached Washington's home. She and Washington went inside and went to bed.

Odom's body was discovered on Gilbert Street in Detroit, Michigan, by Isaac Rivers, a Lyft driver who was working in the area. Rivers called 911, reported seeing the body, and waited in his car until police arrived. Odom had a piece of glass stuck to his back, which a forensic investigator identified as "auto glass," which is typically used to make car windows. A water bottle was found near Odom's body, collected as evidence, and tested for DNA. Defendant's DNA was one of four donors on the water bottle.

Washington and Roberts made a report to police the next day, and Washington turned his truck in to the police as evidence. Odom's blood was found in the backseat of the truck. A bullet casing from the truck was compared to the bullet that was obtained during Odom's autopsy. Brian Grabowski, an expert in firearms and toolmarks analysis, opined the two bullets were fired from the same gun.

Defendant was eventually arrested. He participated in an interrogation with Sergeant Eugene Bomber and Detective Dieasree Curry, who was the officer-in-charge of the case. Defendant initially denied any knowledge of the shooting. However, when presented with evidence obtained from Roberts and Washington, defendant acknowledged there was an argument between the three, which resulted in defendant getting out of Washington's truck and firing his gun. Defendant insisted he fired the gun only two times into the air, not at Washington's truck. Defendant told police he sold the gun to someone in his neighborhood. The police never found the gun. Defendant told police he believed Washington killed Odom.

Roberts passed away in an unrelated automobile accident before defendant was brought to trial. Additionally, 10 months after the shooting, Washington was stopped by police in River Rouge, Michigan. Washington was carrying two guns at the time. Grabowski compared those guns to the bullets collected as evidence and determined that the bullets could not have come from either of them. During trial, Roberts's preliminary examination testimony was read to the jury. Washington surprised the prosecution by asserting his constitutional right to avoid self-incrimination and refusing to testify, which the trial court accepted. The trial lasted four days, and defendant was ultimately convicted by the jury and sentenced as already noted.

After sentencing, defendant moved the trial court for a new trial or a *Ginther*[2] hearing. The trial court denied the motion. Defendant then appealed to this Court. While his appeal was pending, defendant also moved this Court to remand for the trial court to hold a *Ginther* hearing, but the motion was denied.[3] The case is now before us on plenary review.

## II. ANALYSIS

## A. JURY INSTRUCTIONS

Defendant contends the trial court improperly instructed the jury with respect to a number of issues, including voluntary intoxication, and the absence of witnesses at trial.[4] We disagree.

A claim regarding jury instructions is preserved "by challenging [that] aspect of the jury instructions in the trial court." *People v Czuprynski*, 325 Mich App 449, 466; 926 NW2d 282 (2018). There is no dispute that defendant did not object to the jury instructions and did not request additional instructions. As a result, the arguments are unpreserved. *Id.* "[U]npreserved claims of instructional error are reviewed for plain error affecting substantial rights." *People v Spaulding*, 332 Mich App 638, 652; 957 NW2d 843 (2020). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). To show that a defendant's substantial rights were affected, there must be "a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id.* "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *People v Randolph*, 502 Mich 1, 10; 917 NW2d 249 (2018) (citation omitted).

"A criminal defendant has the right to have a properly instructed jury consider the evidence against him." *People v Ogilvie*, 341 Mich App 28, 34; 989 NW2d 250 (2022) (quotation marks and citation omitted). "[T]he trial court is required to instruct the jury concerning the law applicable to the case and fully and fairly present the case to the jury in an understandable manner." *People v Montague*, 338 Mich App 29, 37; 979 NW2d 406 (2021) (quotation marks and citation omitted; alteration in original). In other words, "[o]ne of the essential roles of the trial court is to present the case to the jury and to instruct it on the applicable law with instructions that include . . . any material issues, defenses, and theories that are supported by the evidence." *People v Craft*, 325 Mich App 598, 606-607; 927 NW2d 708 (2018) (quotation marks and citation omitted). "Further, when a jury instruction is requested on any theories or defenses and is supported by

---

[2] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[3] *People v Thomas*, unpublished order of the Court of Appeals, entered December 22, 2022 (Docket No. 359025).

[4] While we agree with the prosecution that this issue was waived by defense counsel's express approval of the instructions as given by the trial court, *People v Davis*, 509 Mich 52, 64; 983 NW2d 325 (2022), we will still address the merits of the arguments because defendant raises these same issues with respect to his claims of ineffective assistance of counsel.

evidence, it must be given to the jury by the trial judge." *People v Mills*, 450 Mich 61, 81; 537 NW2d 909 (1995) (citation omitted), mod 450 Mich 1212 (1995).

## 1. VOLUNTARY INTOXICATION

Defendant first argues the trial court should have instructed the jury regarding voluntary intoxication as a defense to specific-intent crimes. He claims that the trial court instead read an instruction regarding intoxication and general-intent crimes. As noted, the trial court is required to read instructions related to defenses when they are supported by evidence admitted at trial. *Id*.; *Craft*, 325 Mich App at 606-607. The trial court gave the following instruction regarding intoxication as a defense:

> There has been evidence that the Defendant was voluntarily intoxicated with alcohol when the alleged crimes were committed. Voluntary intoxication is not a defense to the crimes charged here. The crimes charged in this case are homicide, murder in the first degree premeditated or in the alternative second degree murder, assault with intent to murder as to Ariel Roberts and Joey Washington, carrying a concealed weapon and three counts of felony firearm.

> So it does not excuse the Defendant if he committed these crimes.

Contrary to defendant's argument, there is no indication that the jury was instructed that the law regarding voluntary intoxication applies *only* to general-intent crimes. Even so, defendant contends that the trial court should have read the following instruction instead:

> (1) The defendant says that [he] could not have specifically intended to [kill] because [he] was intoxicated with alcohol or drugs.

> (2) The defendant is not guilty of [first-degree premeditated murder or AWIM] if the defendant proves by a preponderance of the evidence that [he] lacked the intent to [kill] because [he] voluntarily consumed a legally obtained and properly used medication or other substance and did not know and reasonably should not have known that [he] would become intoxicated or impaired as a result.

> (3) It is not a defense that the defendant was under the influence of or impaired by a voluntarily and knowingly consumed alcoholic liquor, drug, controlled substance, or a combination of them. [M Crim JI 6.2.]

Initially, it is important to note that the trial court's instruction comported with Michigan law, which states, "it is not a defense to any crime that the defendant was, at that time, under the influence of or impaired by a voluntarily and knowingly consumed alcoholic liquor, drug, including a controlled substance, other substance or compound, or combination of alcoholic liquor, drug, or other substance or compound." MCL 768.37(1). This statute "abolished the defense of voluntary intoxication except in one narrow circumstance . . . ." *People v Nickens*, 470 Mich 622, 631 n 7; 685 NW2d 657 (2004) (quotation marks and citation omitted). The narrow circumstance referenced is codified in subsection (2) of the statute, which states:

It is an affirmative defense to a specific intent crime, for which the defendant has the burden of proof by a preponderance of the evidence, that he or she voluntarily consumed a legally obtained and properly used medication or other substance and did not know and reasonably should not have known that he or she would become intoxicated or impaired. [MCL 768.37(2).]

The instruction defendant contends should have been read at trial would have comported with MCL 768.37(2). However, the statute makes the defense an affirmative one for which defendant would bear the burden of proof to show that he voluntarily drank alcohol and did not know he "would become intoxicated or impaired" as a result. *Id*. For the trial court to have been required to read the instruction, there would have needed to be enough evidence on the record to fulfill the preponderance-of-the-evidence standard stated in the statute, including that defendant did not know he would become intoxicated from drinking alcohol. *Id*.; *Craft*, 325 Mich App at 606-607.

Defendant could not meet the burden to show that he did not know alcohol consumption would cause impairment or intoxication. Defendant called no witnesses, did not testify on his own behalf, and introduced no evidence during trial, other than three photographs of bullets, which are not relevant to this issue. Defendant instead relies on Roberts's testimony, in which she stated that defendant was drinking the night of the shooting, and that he did not typically drink significant amounts of alcohol. Further, during defendant's interrogation, he stated several times he could not remember portions of the night because he was intoxicated.

Even assuming all of this was true, the evidence still was not sufficient to support reading the instruction that defendant proposes here. *Craft*, 325 Mich App at 606-607. Although defendant may not drink on a regular basis, there was no evidence on the record suggesting that he did not know drinking alcohol would make him intoxicated. Indeed, it might be more reasonable to infer defendant did not often drink significant amounts of alcohol *because* he knew he would become intoxicated and wanted to avoid it. Defendant did not make any statements in his interrogation which would lead someone to believe he was surprised he was intoxicated. Further, defendant provided no evidence that would have allowed the jury to conclude that defendant "reasonably should not have known" that drinking alcohol would cause him to become intoxicated. MCL 768.37(2). In his interrogation, defendant acknowledged that he was 22 years old, and as such, he was old enough to go to two different bars on the night Odom was killed. Further, Roberts's testimony indicated that defendant did not usually drink a lot, which in turn suggest that he had imbibed alcohol in the past. Thus, the only evidence on the record regarding defendant's knowledge of the effects of alcohol suggested he reasonably *should* have known drinking alcohol would cause intoxication or impairment, rather than the opposite. *Id*.

In sum, the evidence does not support the elements of the voluntary-intoxication defense about which defendant claims the trial court should have instructed the jury. *Id*.; M Crim JI 6.2. When there is no evidence to support a defense theory, a trial court does not err by refusing to read the instruction related to the theory. *Mills*, 450 Mich at 81. Therefore, the trial court did not err, plainly or otherwise, with respect to defendant's argument about the voluntary-intoxication instruction. *Carines*, 460 Mich at 763; *Craft*, 325 Mich App at 606-607.

-5-

## 2.  ROBERTS'S ABSENCE FROM TRIAL

Defendant next argues the trial court should have given a more specific instruction regarding Roberts's absence from trial.  In support of this argument, defendant relies solely on *People v Horton*, 341 Mich App 397; 989 NW2d 885 (2022).  In that case, the defendant was charged with two counts of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(f) (sexual penetration accomplished through force or coercion and causing personal injury).  *Id*. at 399.  Before trial, the complaining witness was killed in a car accident.  *Id*. at 400.  The prosecution sought to use the complainant's testimony from the preliminary examination during the trial.  *Id*.  The prosecution also wanted to introduce evidence for the purpose of informing the jury the complainant died, which the defendant disputed out of concern that such information would cause jurors to feel sympathy for the complainant.  *Id*.  The trial court agreed with the prosecution, and defendant sought interlocutory relief from this Court.  *Id*.

This Court concluded that "[t]he trial court properly determined that evidence that the complaining witness is unavailable to testify because she died in a car accident is relevant."  *Id*. at 405.  This Court reasoned there were instances when the reason a complaining witness did not come to court was relevant.  *Id*. at 405-406.

> For example, if a complaining witness did not appear at trial because the witness recanted and did not want the prosecution to proceed, this fact would clearly reduce the likelihood that the contents of the witness's initial testimony were true, while if a complaining witness did not appear at trial because the witness was threatened by the defendant, this could suggest consciousness of guilt on the part of the defendant. [*Id*.]

Given this understanding of the relevance of the evidence, this Court stated "the knowledge that the complaining witness did not appear because she is dead would assist the jury in assessing her credibility."  *Id*. at 406.  This Court noted that, without the information, the jury might speculate the complainant recanted her testimony.  *Id*.  Alternatively, the jury could wonder whether the complainant did not come to trial because she was afraid of the defendant.  *Id*.  By informing the jury that the complainant died in an unrelated accident, the jury could be assured the complainant's "absence was caused by circumstances that have no bearing on her credibility, and this would negate the risk that the jury might erroneously allow her absence to impact its assessment of her credibility."  *Id*.

In the present case, the trial court read the following instruction regarding Roberts's testimony:  "The testimony of Ariel Roberts was read into this trial because she was not available. This testimony was taken under oath at an earlier hearing.  You should consider this testimony in the same way you consider any other testimony you have heard in court."  Defendant contends the logic in *Horton* applies here—absent an instruction to the contrary, the jury likely speculated Roberts did not come to trial because she was afraid of defendant.

Defendant's reliance on *Horton*, 341 Mich App at 405-406, is misplaced.  In that case, this Court considered whether evidence of the complainant's death was relevant and admissible *as evidence*.  *Id*.  Defendant attempts to use the case to suggest a trial court is required to give an instruction to the jury explaining the reason for a witness's absence when such is an unrelated

death. Frankly, *Horton* provides no such authority, and defendant has not cited to any other caselaw on the topic. If defendant sought to admit the evidence of Roberts's death during trial and the trial court excluded it on the basis of relevance, *Horton* would perhaps support defendant's argument, but such is not the case here.

Instead, defendant contends the trial court should have instructed the jury Roberts died in an event with which defendant was not associated. Recall that, "[o]ne of the essential roles of the trial court is to present the case to the jury and to instruct it on the applicable law with instructions that include . . . any material issues, defenses, and theories that are supported by the evidence." *Craft*, 325 Mich App at 606-607 (quotation marks and citation omitted). In this case, there was no evidence on the record before the jury that Roberts was dead. The issue of admitting her preliminary examination testimony was litigated before trial began. Consequently, there was no reason for the trial court to read the instruction suggested by defendant when it was not "supported by the evidence." *Id.* (quotation marks and citation omitted). Defendant's citation to *Horton*, 341 Mich App at 405-406, provides no authority to the contrary. As a result, the trial court did not err when it failed to instruct the jury about the reason for Roberts's absence from trial. *Id.*; *Craft*, 325 Mich App at 606-607.

### 3. WASHINGTON'S ABSENCE FROM TRIAL

Defendant also contends that the trial court should have provided either no instruction or additional explanation regarding Washington's absence at trial. We again disagree.

In *People v Dyer*, 425 Mich 572, 577-578; 390 NW2d 645 (1986), our Supreme Court considered the proper course of action when a res gestae witness, as opposed to a codefendant, exercised their right against self-incrimination and refused to testify. The Court determined that a witness's decision to remain silent was not relevant evidence and did not warrant a beneficial inference for either the prosecution or the defense. *Id.* at 581. However, the *Dyer* Court acknowledged the failure to a call a known witness "to substantiate a claim of innocence or guilt," could cause the jury to "draw an adverse inference from the *absence* of this evidence." *Id.* at 582. Therefore, our Supreme Court determined the proper course of action, if any, was to provide a "neutralizing instruction," which "explains to the jurors that they may draw no inference from the absence of certain witnesses nor engage in speculation about the possible nature of their testimony." *Id.* Although such an instruction would not be mandatory, explained the Court, one "should be given when properly requested by either party in order to avoid unfair prejudice and to aid in trial strategy." *Id.* at 583.

In the present case, the prosecution expected Washington to testify during trial. During jury selection, the prosecution listed Washington as one of their witnesses. Further, when giving the opening statement, the prosecution referenced information provided to the police by Washington on two occasions. The prosecution also discussed, in depth, Washington's involvement in the shooting, his dispute with defendant about going to a Coney Island restaurant, and how he was upset about defendant's threat to slap Roberts. When the prosecution learned Washington would not be testifying during trial, the prosecution sought a neutralizing instruction, noting the jury would be expecting Washington's testimony after the opening statement. The trial court agreed and provided it: "You heard the prosecutor state in the opening statement that a

witness Joey Washington would testify in this case. Joey Washington has not testified in this matter and you are not to draw any conclusions from his lack of testimony."

Here, the prosecution requested the neutralizing instruction to limit any unfair prejudice the jury may have attributed to the fact Washington did not show up to testify as promised. The trial court provided the instruction. Contrary to the argument by defendant, the neutralizing instruction was enough to discourage any speculation from the jury regarding why Washington did not testify at trial. *Id.* Consequently, defendant's contention the trial court plainly erred by deciding not to read a more detailed instruction or to read no instruction at all lacks merit. *Id.*

### 4. LESSER INCLUDED OFFENSE

Finally, defendant argues the trial court plainly erred by failing to read the jury instruction for assault with intent to commit great bodily harm less than murder (AWIGBH), MCL 750.84, as a lesser included offense of AWIM. Our Supreme Court has explained "that a defendant is entitled to a lesser offense instruction only if that lesser offense is necessarily included in the greater offense[.]" *People v Jones*, 497 Mich 155, 164; 860 NW2d 112 (2014). "Necessarily included lesser offenses are offenses in which the elements of the lesser offense are completely subsumed in the greater offense." *Nickens*, 470 Mich at 626 (quotation marks and citation omitted). As to whether such an instruction should be given, our Supreme Court stated, "a requested instruction on a necessarily included lesser offense is proper if the charged greater offense requires the jury to find a disputed factual element that is not part of the lesser included offense and a rational view of the evidence would support it." *People v Cornell*, 466 Mich 335, 357; 646 NW2d 127 (2002).

"Failure to instruct on a lesser included offense undermines reliability in the verdict only 'when the evidence "clearly" supports the lesser included instruction, but the instruction is not given.' " *People v Everett*, 318 Mich App 511, 529; 899 NW2d 94 (2017), quoting *Cornell*, 466 Mich at 365. "In analyzing whether the evidence 'clearly' supports the instruction, we must consider the 'entire cause,' including evidence that has been offered to support the greater offense." *Everett*, 318 Mich App at 529. Although AWIGBH is considered a lesser included offense of AWIM, the crimes " 'are distinguishable from each other by the intent required of the actor at the time of the assault.' " *Id.*, quoting *People v Brown*, 267 Mich App 141, 148; 703 NW2d 230 (2005). In other words, "AWIM requires an actual intent to kill that is not a part of AWIGBH." *Everett*, 318 Mich App at 529.

According to the applicable caselaw, the trial court need only have instructed the jury regarding AWIGBH as a lesser included offense of AWIM if "a rational view of the evidence would support it." *Cornell*, 466 Mich at 357. However, there was no evidence on the record that defendant intended solely to cause great bodily harm to anyone, or that he lacked the actual intent to kill. Defendant fired his gun into Washington's pickup truck, which he knew contained three people. Defendant was angry at the time, as a result of arguing with Roberts and Washington, and jumped out of the vehicle before firing shots into it. The prosecution contended that this showed defendant intended to kill someone inside the vehicle. Malice, which includes an intent to kill or cause great bodily harm, can "be inferred from the use of a deadly weapon." *Carines*, 460 Mich at 759.

During his interrogation, defendant denied ever purposefully shooting bullets into Washington's truck, insisting that he instead fired his gun into the air. He claimed he was angry, was arguing with Washington and Roberts, and just wanted to escape the situation. Defendant stated that Washington was carrying a gun and waving it around, so defendant jumped out of the vehicle and fired his gun into the air. Defendant never stated that he was only trying to hurt someone when he did so, as opposed to trying to kill someone, or something along those lines. Instead, defendant outright denied that he fired his gun at Washington's truck. Defendant explained his girlfriend was inside, and despite their argument, he did not want to hurt her. Defendant also said he did not want to hurt Odom, who was defendant's friend.

Consequently, there were two theories of what occurred during the morning in question. According to the prosecution, defendant wanted to kill someone inside the vehicle when he fired his gun into it. Defendant, on the other hand, claimed he fired the gun into the air and did not mean to hurt anyone. While an intent to cause great bodily harm can be inferred from the use of a deadly weapon, an intent to kill can also be inferred from such. *Carines*, 460 Mich at 759. Recall that there is only error undermining a jury's verdict if the evidence "clearly" supports a finding that the lesser included offense was committed. *Everett*, 318 Mich App at 529. Here, the evidence did not clearly support that defendant intended only to cause someone to suffer great bodily harm. Instead, the evidence showed defendant either intended to kill someone inside of the truck, or did not intend to hurt anyone at all. *Id.*

Defendant argues this Court should reach the opposite conclusion because the jury had the opportunity to convict him as charged of first-degree premeditated murder, but instead chose to convict him of second-degree murder. Although not well-explained by defendant, the argument implies that the jury would have chosen the lesser included offense of AWIGBH instead of AWIM if given the option because they did so for the murder charge. The logic of the argument does not stand up to legal scrutiny. Again, the difference between AWIM and AWIGBH relates to defendant's intent. For AWIM, the prosecution had to prove defendant intended to kill someone, whereas for AWIGBH, the prosecution only had to show that defendant intended to cause someone great bodily harm. *Everett*, 318 Mich App at 529; *Brown*, 267 Mich App at 147.

First-degree premeditated murder and second-degree murder lack that same degree of difference. As explained by our Supreme Court, the elements of first-degree premeditated murder "are (1) the intentional killing of a human (2) with premeditation and deliberation." *People v Oros*, 502 Mich 229, 240; 917 NW2d 559 (2018) (quotation marks and citation omitted). On the other hand, "[t]he elements of second-degree murder are (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse." *People v Wafer*, 509 Mich 31, 40; 983 NW2d 315 (2022) (quotation marks and citation omitted). "Malice is defined as the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *People v Baskerville*, 333 Mich App 276, 284; 963 NW2d 620 (2020) (quotation marks and citation omitted).

Defendant's argument relies on an inference that the jury did not believe he intended to kill anyone, which is why he was convicted of second-degree murder instead of first-degree premeditated murder. However, a conviction of second-degree murder is still consistent with having an intent to kill. *Id.* While there are other potential states of mind to prove malice, intent

to kill is undoubtedly one of them. *Id*. Given the jury's verdict in this case, the most cogent explanation is that the jurors believed defendant intended to kill someone when he fired the gun into Washington's vehicle, but did not premeditate or deliberate about the decision, as is required to prove that a defendant is guilty of first-degree premeditated murder. Consequently, defendant's reliance on the jury convicting him of second-degree murder is legally misplaced. It does not affect the analysis of whether the evidence clearly supported an instruction for AWIGBH. Because such was not clearly supported by the evidence, the trial court did not err, plainly or otherwise, when it decided not to read the AWIGBH instruction as a lesser included offense of AWIM. *Cornell*, 466 Mich at 365; *Everett*, 318 Mich App at 529.

For all of these reasons, we conclude that none of the contested jury instructions were given in error. Defendant is not entitled to relief on this basis.

## B. FAIR TRIAL

Defendant next contends his constitutional due-process right to a fair trial was violated by comments made by the trial court and Detective Curry. We disagree.

To preserve a constitutional claim, such as one involving the right to a fair trial, a defendant must "raise an objection on the ground" also raised on appeal. *People v Brown*, 326 Mich App 185, 191-192; 926 NW2d 879 (2019). It is undisputed that defendant did not object to the identified constitutional issues during trial. Consequently, they are not preserved for our review. *Id*. "[W]e review unpreserved constitutional issues for plain error affecting substantial rights." *People v Burkett*, 337 Mich App 631, 635; 976 NW2d 864 (2021) (quotation marks and citation omitted). Plain-error review was summarized above and applies here.

"The United States Constitution and the Michigan Constitution each guarantee that a criminal defendant receives due process of law." *Horton*, 341 Mich App at 401, citing US Const, Am XIV; Const 1963, art 1, § 17. "Implicit in this guarantee is that each criminal defendant enjoys the right to a fair trial . . . ." *Horton*, 341 Mich App at 401, citing *People v Johnson*, 315 Mich App 163, 179; 889 NW2d 513 (2016). " '[A]n important element of a fair trial is that a jury consider only relevant and competent evidence bearing on the issue of guilt or innocence . . . .' " *People v Hana*, 447 Mich 325, 350; 524 NW2d 682 (1994), amended 447 Mich 1203 (1994), quoting *Zafiro v United States*, 506 US 534, 540; 113 S Ct 933; 122 L Ed 2d 317 (1993). However, as our Supreme Court has explained, defendant is only "entitled to a fair trial but not a perfect one for there are no perfect trials." *People v Miller*, 482 Mich 540, 559; 759 NW2d 850 (2008) (quotation marks and citation omitted).

Defendant contends that his right to a fair trial was violated because 1) the trial court made an improper statement while ruling on a defense objection to testimony by Detective Curry, and 2) Detective Curry provided inappropriate testimony shortly afterward. Relevant to this issue, while examining Detective Curry, the prosecution moved to admit text messages between defendant and Roberts found on defendant's cell phone. The defense objected to admission of the messages on the basis of a lack of foundation. The trial court considered the objection in a bench conference, which was not transcribed. The trial court then announced its decision, with the jury present, stating: "At this time the Court is not going to allow the text messages to be admitted based upon [defendant's] objection as to lack of foundation and in this Court's view it is also

accumulative in nature." Later, during Detective Curry's testimony, the prosecution asked if there was "anything else that you did in relation to this case that we have not discussed so far in terms of your investigation?" Detective Curry answered: "Basically just the stuff that is not admitted."

Defendant argues that both of these events implied there was additional evidence supporting the prosecution's case that had not been introduced during trial. Pertinently, the trial court referring to the text messages as "accumulative in nature," suggested they contained the same inculpatory information already admitted at trial. Further, Detective Curry claiming she investigated the case in other ways not admitted did not suggest she was aware of more evidence to which the jury was not privy. Defendant's argument is not supported by the record, and therefore, must fail. "An appellant bears the burden of 'furnishing the reviewing court with a record to verify the factual basis of any argument upon which reversal [is] predicated.'" *Czuprynski*, 325 Mich App at 470 n 3, quoting *People v Elston*, 462 Mich 751, 762; 614 NW2d 595 (2000) (alteration in *Czuprynski*).

The trial court's comment about the proposed documentary evidence being "accumulative in nature" did not suggest there was additional evidence of which the jury was not aware. Instead, the comment by the trial court specifically expressed to the jury that the evidence had already been presented, albeit in a different format. This conclusion is supported by the record, which shows that Roberts testified at the preliminary examination about receiving threatening text messages from defendant on the day of the shooting. Further, during his interrogation, defendant agreed he sent several text messages to Roberts. Consequently, the record shows that the trial court denied the prosecution's request to admit the text messages, at least in part, because the testimony and other evidence introduced at trial already established that the text messages existed. This did not permit the jury to speculate about the content of the messages, and certainly did not indicate that they were novel in nature or beneficial to the prosecution's theory of the case. Because the factual record provided to us does not support the desired inference sought by defendant, his claim fails. *Czuprynski*, 325 Mich App at 470 n 3.

Defendant's argument regarding Detective Curry's comment fails for the same reason. The record does not suggest that Detective Curry referenced other inculpatory evidence the jury had yet to consider. Instead, Detective Curry plainly was discussing the text messages, which had just been deemed inadmissible by the trial court. The record indicated that Detective Curry obtained the text messages as a part of her investigation into the case. Indeed, during defendant's interrogation, it was clear that the police had access to defendant's text messages, given that defendant acknowledged sending messages to Roberts. Further, it is plain that Detective Curry was referring to the text messages in her testimony, since the trial court had just recently ruled on the issue. Accordingly, defendant's argument is simply unsupported by the record, and his claim must fail.

Moreover, to the extent these statements by the trial court and Detective Curry could be considered erroneous in some manner, there can be little dispute that they were at most minor errors. Our Supreme Court has been clear that a defendant has a due-process right to a fair trial, but not a perfect trial. *Miller*, 482 Mich at 559. The objectively minor concerns raised by defendant regarding the challenged statements simply do not rise to the level that would cause concerns about his right to a fair trial. *Id*. While imperfect, defendant has not identified any issues

that would cause his trial to be considered "unfair," which is the relevant inquiry. *Id*. Therefore, defendant's claims do not warrant reversal as a violation of his right to a fair trial. *Id*.

## C. PROSECUTORIAL MISCONDUCT[5]

Defendant argues the prosecutor committed misconduct in a number of different ways during closing arguments. We disagree.

In cases alleging prosecutorial misconduct, issues are "preserved by contemporaneous objections and requests for curative instructions . . . ." *People v Mullins*, 322 Mich App 151, 172; 911 NW2d 201 (2017) (quotation marks and citation omitted). Here, it is undisputed that defendant neither objected to the alleged prosecutorial misconduct nor requested a curative instruction. As a result, this issue is not preserved for review. *Id*. "Unpreserved claims of prosecutorial misconduct are reviewed for plain error affecting substantial rights." *People v Clark*, 330 Mich App 392, 433; 948 NW2d 604 (2019). Plain-error review was summarized above and applies here.

This Court "evaluate[s] instances of prosecutorial misconduct on a case-by-case basis, reviewing the prosecutor's [actions] in context and in light of the defendant's arguments." *People v Lane*, 308 Mich App 38, 62-63; 862 NW2d 446 (2014). "Generally, '[p]rosecutors are accorded great latitude regarding their arguments and conduct.' " *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995) (citation omitted). "They are free to argue the evidence and all reasonable inferences from the evidence as it relates to [their] theory of the case." *Id*. (quotation marks and citation omitted; alteration in original). In making those arguments, "[t]he prosecutor need not speak in the blandest of all possible terms." *People v Blevins*, 314 Mich App 339, 355; 886 NW2d 456 (2016) (quotation marks and citation omitted).

### 1. CIVIC-DUTY ARGUMENT

Defendant first claims the prosecutor committed misconduct by making an improper civic-duty argument. While prosecutors generally are provided latitude to make arguments, they "should not resort to civic duty arguments that appeal to the fears and prejudices of jury members . . . ." *Bahoda*, 448 Mich at 282. In other words, "[t]he prosecutor may not inject issues into a trial that are broader than the defendant's guilt or innocence." *Lane*, 308 Mich App at 66. As explained by this Court, error arises when "a prosecutor urge[s] the jury to convict as part of its civic duty or on the basis of its prejudices." *People v Unger*, 278 Mich App 210, 237; 749 NW2d 272 (2008).

Defendant challenges the following statements made by the prosecutor during closing arguments:

> Then there were some other kinds of witnesses. We had [Odom's mother] herself who testified about the loss of her child. We had Mr. Rivers who came in

---

[5] We employ the phrase "prosecutorial misconduct" as a term of art synonymous with "prosecutorial error," not as an indication that the prosecution engaged in intentional misconduct. *People v Jackson (On Reconsideration)*, 313 Mich App 425 n 4, 431; 884 NW2d 297 (2015).

-12-

here and, like you, a person who did his civic duty, a man who was doing his job as a [Lyft] driver and came across a body in the street.

Unlike the car in front of him which swerved and kept going Mr. Rivers called 911. Mr. Rivers waited for the ambulance and directed the ambulance to where the body lay. Mr. Rivers stuck around and talked to the police and Mr. Rivers came here and testified to you. He did all of those things because he's a good citizen and did the things that we would expect someone who came across a body in the street to do. Believe me, that doesn't always happen. So Mr. Rivers and [Odom's mother] are civilian witnesses. They're just telling you what they know.

Defendant suggests this was an improper civic-duty argument by the prosecutor. Defendant is incorrect.

Recall that the concern about a civic-duty argument is a prosecutor urging the jury to convict a defendant because it is their civic duty to do so. *Unger*, 278 Mich App at 237. In other words, it is not improper for a jury to be told that reporting for jury duty is a civic duty. *Id*. In this instance, the prosecutor did not encourage the jurors to convict defendant because it was their civic duty. Instead, the prosecutor was simply explaining that Rivers called police and stayed near Odom's body because he was doing his civic duty. To draw a comparison, the prosecutor noted the jurors had all done their civic duty by showing up to jury duty. The jurors were aware they were performing a civic duty because the trial court told them so during jury selection. Consequently, because the prosecutor did not argue that the jury should convict defendant because it was their civic duty to do so, there was no improper civic-duty argument as alleged by defendant. *Unger*, 278 Mich App at 237.

Defendant also claims the prosecutor made an improper civic-duty argument by advocating for the jury to do "justice" for Odom's family. Defendant identifies the following argument from the prosecutor during closing arguments:

Do I present the people who did the scientific analysis? Yes. Did they do that? Did they tell you what they found? Yes. Is it served up like fiction? No. Fiction doesn't have a pandemic. Fiction doesn't have to wait while witnesses come in from the car, but this is real, very, very real for Mr. Odom's family. He deserves justice and that's your job. That's your job to determine.

The question in this case is whether there is reasonable doubt. Reasonable doubt that [defendant] is the person who fired that weapon into the truck with the results that we know happened. A doubt is not beyond all doubt. All doubt? It's a doubt based on reason and the Judge will define that for you, but what have you heard?

Defendant asserts that this argument suggested the jury should convict defendant to ensure Odom's family could have justice. Defendant is incorrect.

Recall again that an argument by the prosecutor is improper if it "appeal[s] to the fears and prejudices of jury members," *Bahoda*, 448 Mich at 282, or "inject[s] issues into a trial that are broader than the defendant's guilt or innocence," *Lane*, 308 Mich App at 66. In *Lane*, this Court

noted that there is a difference between stating that a jury had to convict a defendant to provide justice for a family, and urging "the jury to find [the defendant] guilty on the basis of the evidence and its sense of judgment, and, as a result, [the victim] would have justice." *Id*. When considering the argument of the prosecutor in this case, it is clear the situation closely resembles the facts presented in *Lane*. Pertinently, the prosecutor did not argue the jury had to convict defendant to provide justice to Odom and his family. Instead, the prosecutor argued Odom and his family took this case seriously, wanted justice, and it was up to the jury to decide whether such justice could be provided by a conviction. This is obvious because, after making the challenged argument, the prosecutor reminded the jurors of the burden of proof that needed to be met to warrant convictions. If the prosecutor sought to have the jurors convict defendant on the basis of doing justice, the prosecutor would not be keen to remind those jurors of the significant burden the prosecutor must meet. When considered in context, the prosecutor's comments were not improper because they did not encourage the jurors to consider issues "broader than the defendant's guilt or innocence," *Lane*, 308 Mich App at 66.

## 2. BURDEN-SHIFTING ARGUMENT

Next, defendant argues the prosecutor committed misconduct by improperly shifting the burden of proof to the defense during closing arguments. "A prosecutor may not imply in closing argument that the defendant must prove something or present a reasonable explanation for damaging evidence because such an argument tends to shift the burden of proof." *People v Fyda*, 288 Mich App 446, 463-464; 793 NW2d 712 (2010). "Also, a prosecutor may not comment on the defendant's failure to present evidence because it is an attempt to shift the burden of proof." *Id*. at 464. "While the prosecution may not use a defendant's failure to present evidence as substantive evidence of guilt, the prosecution is entitled to contest fairly evidence presented by a defendant." *People v Caddell*, 332 Mich App 27, 71; 955 NW2d 488 (2020) (quotation marks and citation omitted). "Moreover, attacking the credibility of a theory advanced by a defendant does not shift the burden of proof." *People v McGhee*, 268 Mich App 600, 635; 709 NW2d 595 (2005). Further, "a prosecutor's argument that inculpatory evidence is undisputed does not constitute improper comment." *Fyda*, 288 Mich App at 464.

Defendant asserts the prosecutor shifted the burden of proof in violation of the above caselaw during the following portion of her closing argument and rebuttal argument:

> You have heard from all of those witnesses about the science which on this record is uncontroverted. That means there is no challenge to it. There's nobody who said anything different. It is what it is. We have it in front of us. We know what it means.

> \* \* \*

> He's got one thing right, this is real. He's got one thing right in all that nonsense you just heard. He wants to challenge the forensic scientists? Okay. Challenge 'em [sic]. With what? He didn't challenge 'em [sic] with anything. These people are experts and it is not junk or this Court would never let that scientific evidence into this courtroom. Those scientists came and told you—and they have no dog in this show. She don't [sic] care what the outcome of this case

-14-

is. They're [sic] job is to analyze the scientific evidence that is in front of them and that is the entirety of their job.

Did they do that? Absolutely. Absolutely they did. Did the firearm—you've seen some photographs taken through a microscope and reproduced on a computer tell you anything? I'm guessing it didn't because all you saw was some lines.

You're not the experts, but the person with the training is. Is there anything that happened in this courtroom that changed his version of the events? No. Did he tell you that his stuff was reviewed by other people? Absolutely.

Did anybody challenge his results? No. Why? Because it's true. Those bullets were fired from one gun, his. He's the person who fired the weapon, not anybody else, not some mythical I don't know who . . . .

Defendant contends these arguments were improper because they suggested defendant was required to obtain his own expert witnesses to dispute the opinions of the prosecution's experts. Defendant is again incorrect.

During trial, there were two significantly relevant pieces of forensic evidence. The first was defendant's DNA on the water bottle found near Odom's body. The second was the bullets found during Odom's autopsy and in Washington's truck, which an expert determined were fired from the same gun. The two guns found on Washington when he was arrested by police were not the guns that fired the bullets. One of the defense's strategies was to challenge the forensic evidence during cross-examination of the expert witnesses. With respect to defendant's DNA on the water bottle, defendant vigorously cross-examined Sarah Barr, an expert in DNA, about the number of possible donors on the water bottle. Barr testified that in her expert opinion, there were four donors. She agreed that the evidence suggested there might have been up to six donors. Barr acknowledged that, if there were six donors, the technology available to her would have been unable to run tests to compare the DNA to defendant. Defendant's cross-examination suggested that Barr purposely reduced the number of possible donors so she could run the test, which resulted in a match of defendant's DNA. Despite challenging Barr in this manner, defendant did not introduce any expert testimony from any other witnesses suggesting Barr's opinion was incorrect or that there were actually six donors on the water bottle.

With respect to the bullets, defendant challenged Grabowski, the expert in toolmarks and firearms, regarding his testimony that the two bullets were fired from the same gun. To do so, defendant introduced close-up photographs of the bullets. Defendant asked Grabowski about the differences between the two bullets, and given those differences, how he could be certain they were fired from the same gun. Grabowski testified that, on the basis of his training, he could see that there were enough similar marks on the bullets to conclude that they were fired from the same gun. Further, Grabowski determined that the two guns found in Washington's possession did not fire the bullets. Defendant did not introduce testimony from any other expert witness in the field establishing the bullets were fired from separate weapons, or were both fired from one of Washington's guns.

When considering the prosecutor's arguments in the context of the defense strategy during trial, it is clear the prosecutor was not shifting the burden of proof to defendant. Instead, the prosecutor was noting that, despite attempting to undermine the testimony of the expert witnesses, defendant had not introduced testimony contradicting the opinions of the experts. As this Court has explained, "a prosecutor's argument that inculpatory evidence is undisputed does not constitute improper comment." *Fyda*, 288 Mich App at 464. Such is the case here, where defendant did not introduce evidence to dispute the expert's findings. *Id.* The prosecutor's challenged arguments were also a manner for the prosecutor to argue against the theory presented by the defense—that the forensic evidence was somehow botched or unreliable. At most, the prosecutor was merely "attacking the credibility of a theory advanced by a defendant," which "does not shift the burden of proof." *McGhee*, 268 Mich App at 635.

Defendant also referenced the photographs of the bullets when challenging Grabowski's testimony about the toolmark analysis. Defendant suggested Grabowski's testimony was unreliable because the differences between the two bullets indicated they were fired from different guns. Given defendant's reliance on evidence, the prosecutor was permitted to contest it fairly during closing arguments. *Caddell*, 332 Mich App at 71. The prosecutor did so in this case by noting there was no testimony from another expert witness suggesting the differences on the bullets indicated they were fired from different guns. Therefore, the prosecutor properly noted the jury was left solely with Grabowski's expert testimony, in which he concluded the bullets were fired from the same gun. Because the prosecutor was permitted to challenge defendant's evidence by arguing about other evidence on the record, there was no error with respect to this portion of the closing argument. *Id.* In sum, the prosecutor did not engage in any arguments that impermissibly shifted the burden of proof to defendant. *Id.*; *Fyda*, 288 Mich App at 464; *McGhee*, 268 Mich App at 635.

### 3. VOUCHING

Defendant additionally argues the prosecutor improperly vouched for her witnesses at trial. Defendant is correct that "[a] prosecutor may not vouch for the credibility of a witness by conveying to the jury that he has some special knowledge that the witness is testifying truthfully." *Clark*, 330 Mich App at 434. However, "a prosecutor may comment on his *own* witnesses' credibility during closing argument, especially when there is conflicting evidence and the question of the defendant's guilt depends on which witnesses the jury believes." *People v Jackson (On Reconsideration)*, 313 Mich App 409, 426; 884 NW2d 297 (2015) (quotation marks and citation omitted) (emphasis added). In *People v Howard*, 226 Mich App 528, 548; 575 NW2d 16 (1997), this Court explained that while a prosecutor is not permitted to vouch for the credibility of their witnesses, or to "suggest that the government has some special knowledge that the witness is testifying truthfully," the prosecution "may [] argue from the facts that a witness is credible or that the defendant or another witness is not worthy of belief."

Defendant identifies four separate statements by the prosecutor during her closing argument, each of which he claims are instances of improper vouching. Initially, when discussing the forensic analysis of Washington's truck, the prosecutor made the following statements:

> And then you heard from Corporal [Eugene] Fitzhugh who told you about
> the analysis that he did in examining that truck. He's not making anything up. He

> simply recorded what he observed and what he saw and what he found and what did he find?
>
> He found that both rear windows of that truck are shattered. We know that a piece of glass is found on Mr. Odom's back. How did that automotive glass get on his back? Because the rear windows were shot out.

As noted above, the defense sought to undermine the forensic evidence in this case to obtain an acquittal. Therefore, when arguing her case, the prosecutor sought to ensure the jurors understood the testimony of various forensic witnesses was on the basis of evidence obtained during the investigation. Here, the prosecutor noted that Corporal Fitzhugh simply recorded what he observed while examining Washington's truck. Because Corporal Fitzhugh solely wrote down and testified about what he observed, the prosecutor asserted he did not make anything up. Importantly, the prosecutor did not suggest she had special knowledge of Corporal Fitzhugh's veracity, but instead noted that the available evidence supported Corporal Fitzhugh's testimony. *Clark*, 330 Mich App at 434. According to relevant caselaw, this was a permissible instance of the prosecutor arguing a witness's testimony was credible because it comported with the physical evidence available. *Howard*, 226 Mich App at 548.

Next, defendant claims the prosecutor erred during closing argument by stating that Roberts was telling the truth. However, when reviewing the comment in context, the meaning of the prosecutor's statement is clarified: "Ariel Roberts told you that Mr. Washington was fearful, that everyone was frightened by what had happened. So you get to read her testimony. You get to determine what credibility you want to give it, but I'm arguing to you that what she said is the truth." By taking the end of that argument out of context, defendant hopes to convince us the prosecutor simply stated Robert's testimony was true. However, as noted above, a prosecutor's comments must be reviewed in context. *Lane*, 308 Mich App at 62-63. When considering the relevant argument surrounding the challenged statement, it is clear the prosecutor was not claiming to have special knowledge that Roberts was telling the truth. *Clark*, 330 Mich App at 434. Instead, the prosecutor urged the jurors to read Roberts's testimony, which had been admitted in documentary form because of her unavailability at trial, and decide whether they believed she was telling the truth. The prosecutor was permitted to advocate that her witnesses, including Roberts, were worthy of belief by the jurors. *Jackson*, 313 Mich App at 426. Consequently, the prosecutor did not err by making the arguments above. *Id*.

Additionally, defendant challenged an argument by the prosecutor regarding Sergeant Bomber, who had participated in defendant's interrogation. While defendant only cites a single sentence, "He told you the truth;" the context of the statement is equally important:

> Let's talk about credibility. When you talk about witnesses you have to examine—and we talked about this in voir dire. What—how do you determine if somebody is telling you the truth?
>
> What do you look at? Who has some reason to lie to you? Did you hear anybody who had a reason to lie to you? Did you hear anyone who came in here with some preset agenda? No. The officers did what they did. It's part of their job.

I guess the only two that you could accuse of that perhaps would be the officer in charge and Sergeant Bomber, but what did Sergeant Bomber tell you? When I'm in an interrogation I'm entitled to search[] for the truth by fudging things I say. I'm not sworn to tell the truth in an interrogation room, but I'm sworn to tell the truth here and that's what he did. He told you the truth.

One of the most significant pieces of evidence during trial was the video of defendant's interrogation. In it, he begins by denying any knowledge of the shooting. Eventually, when challenged with evidence obtained by the police, defendant begins to admit certain facts. While defendant never admitted to purposefully firing his gun into Washington's truck, he did agree he jumped out of the truck because he was angry and fired two bullets into the air. To undermine the inculpatory nature of defendant lying to police before admitting his involvement in the incident, defendant vigorously cross-examined Sergeant Bomber, who participated in the interrogation. Pertinently, defendant attempted to convince the jurors that Sergeant Bomber was not credible because he lied during the interrogation. Sergeant Bomber admitted during his testimony that he lied to defendant about certain things, such as the video evidence available to police. However, he also testified that he was permitted to lie to a person accused of a crime during an interrogation as a valid technique to elicit the truth. Sergeant Bomber insisted such was what he did during the interrogation of defendant, and asserted he was telling the truth during trial because he was under oath.

As noted above, the prosecutor's arguments must be considered in context, and the context must include the arguments and theories proposed by defendant. *Lane*, 308 Mich App at 62-63. Defendant sought to portray Sergeant Bomber as a liar. In response, the prosecutor argued that there were reasons the jury should believe Sergeant Bomber's testimony. Chief among those reasons was Sergeant Bomber's acknowledgment that he was permitted to lie to defendant during the interrogation, but that he would not do so while under oath and testifying to the jury. The prosecutor was permitted to argue that Sergeant Bomber was credible and worthy of belief despite defendant's reference to Sergeant Bomber lying to defendant during the interrogation. *Jackson*, 313 Mich App at 426. The prosecutor did not claim some special knowledge of Sergeant Bomber's veracity, but instead referenced his testimony and the facts of the case, which was not improper. *Clark*, 330 Mich App at 434. Therefore, when considering the challenged argument in context, as we must, defendant's claim fails. *Lane*, 308 Mich App at 62-63.

Defendant also contends that the prosecutor generally vouched for her witnesses by making the following statement during rebuttal argument: "So, ladies and gentlemen, do not be confused by what you heard from the defense. There is no one who testified in this case who lied to you. They told the truth about what happened, their portion of it, small or large. Nobody lied. Nobody made anything up." Once again, defendant hopes to ignore the context of the prosecutor's arguments when claiming she vouched for her witnesses in an improper manner. As is clear from the analysis above, defendant's strategy during trial was to convince the jurors the prosecutor's witnesses were not worthy of belief. When considering all the instances of alleged vouching, it was noted defendant asserted Barr, Grabowski, Sergeant Bomber, and Detective Curry were not worthy of being believed for various reasons. It is clear why the prosecutor believed it was necessary to argue to the jury those witnesses were telling the truth. Once again, the prosecutor did not claim to possess any special knowledge about the various witnesses' veracity, but instead referenced the testimony, potential reasons for lying, and the witnesses' jobs as reasons why the

jury should find them credible. Given defendant's trial strategy and the prosecutor advocating on the basis of evidence and testimony instead of special knowledge, the prosecutor's argument about the witnesses not lying was permissible. *Clark*, 330 Mich App at 434; *Lane*, 308 Mich App at 62-63.

## 4. FACTS NOT IN EVIDENCE

Defendant's final argument on the subject of prosecutorial misconduct is that the prosecutor erroneously argued facts not in evidence. "Although a prosecutor may not argue facts not in evidence or mischaracterize the evidence presented, the prosecutor may argue reasonable inferences from the evidence." *People v Anderson*, 331 Mich App 552, 565; 953 NW2d 451 (2020) (quotation marks and citation omitted). Here, defendant states the prosecutor argued a fact not in evidence by asserting the shooting occurred on Gilbert Street. The prosecutor stated the following: "It didn't happen someplace else. It didn't happen at some mythical gas station. It didn't happen at a mythical Coney Island. It happened on Gilbert Street and we've established that to you." As noted above, the prosecutor is "accorded great latitude regarding their arguments and conduct," and "[t]hey are free to argue the evidence and all reasonable inferences from the evidence as it relates to [their] theory of the case." *Bahoda*, 448 Mich at 282 (quotation marks and citation omitted). In making those arguments, "[t]he prosecutor need not speak in the blandest of all possible terms." *Blevins*, 314 Mich App at 355 (quotation marks and citation omitted).

The evidence admitted at trial showed that Odom's body was found on Gilbert Street near Michigan Avenue in the early morning hours of November 23, 2019, after the shooting occurred. Roberts recalled Washington pulling quickly away, but she kept her head tucked under the dashboard for protection. She heard Washington stop for a brief moment, doors opening and closing, and then Washington driving away again. A security camera on a house on Gilbert Street recorded a pickup truck resembling Washington's truck driving down the street at the relevant time on November 23, 2019.

As noted, defendant contends this evidence does not support the prosecutor's claim the shooting occurred on Gilbert Street. Defendant is incorrect. There was little testimony establishing where Washington's vehicle was when the shooting began. Roberts was the only person inside the vehicle at the time who testified. While Roberts believed Washington drove away from the location before presumably dumping Odom's body and returning home, there was no testimony indicating Washington turned off of the road on which the shooting occurred. Consequently, Roberts's testimony does not rule out the possibility Odom was shot and his body was removed from Washington's vehicle on the same street—Gilbert Street. Because the prosecutor is "free to argue the evidence and all reasonable inferences from the evidence as it relates to [their] theory of the case," her claim that Odom was shot on Gilbert Street was not improper. *Bahoda*, 448 Mich at 282 (quotation marks and citation omitted). In short, the prosecutor was not arguing a fact not in evidence, but instead was arguing an inference available from the evidence and testimony admitted at trial. *Id*. Consequently, there was no error. *Id*.

Next, defendant asserts the prosecutor argued facts not in evidence by claiming no one was in the area of the shooting to observe what happened or to commit it, other than Washington, Roberts, Odom, and defendant. The prosecutor stated: "This isn't a case where there's some other random person was on the street and pulled off this murder. There isn't anybody else there.

There's the three in the car—the truck and there's [defendant]. He's it. Nobody else can be accused of this crime." Defendant references the lack of testimony supporting there was no one else around when the shooting occurred. Defendant notes Roberts was the only person there who provided testimony, and she had her head down for almost all of the relevant time.

This argument once again ignores the prosecutor's ability to argue inferences available from the evidence. *Bahoda*, 448 Mich at 282. Roberts's testimony indicated that the shooting occurred after 3:00 a.m. on November 23, 2019. Roberts did not give any indication that there were bystanders in the area or that anyone else saw the shooting take place. When Odom's body was found by Rivers, he called 911. In the recording, he noted the surrounding area was dark. Rivers also did not indicate that there were any other people in the area, other than Odom's body. Further, the home security footage showed Washington's truck driving down Gilbert Street during the relevant time, and there were no other people on the street observable in the video. From all of this evidence, one could infer there was no one else around when the shooting occurred. As established, the prosecutor was permitted to argue inferences available from the evidence. *Id*. Consequently, the prosecutor did not err when she claimed there was no one else around to either observe or commit the crime at issue. *Id*.

Defendant also argues the prosecutor committed misconduct by claiming Washington could not have shot Odom because the bullets did not match Odom's guns. In making this argument, defendant cites solely to one page of transcript, but does not quote the specific language he believes was improper. It appears defendant is relying on the following argument of the prosecutor:

> There came a point in time obviously where Mr. Washington came in contact with River Rouge police and that was some ten months after this incident. So in those ten months Mr. Washington has this contact with the River Rouge police and his guns are confiscated, a Glock and a Smith & Wesson.
>
> And then when Mr. Grabowski talked to you about not only the bullets, he talked to you about the guns. What does it mean to have those guns on evidence? Well, you heard [defendant] tell the police, [Washington] did it. Wasn't me, [Washington] did it. Well, [Washington]'s guns don't match the bullets, folks. They're not the same. They could not have fired those bullets.

Defendant argues this was an improper claim from the prosecutor because there was no evidence presented to show that Washington did not own other guns, which might have been capable of firing the bullets introduced as evidence in this case. Therefore, defendant insists that the prosecutor's claim that Washington could not have been the person who shot Odom was not supported by the record.

As can be seen from the argument quoted above, the prosecutor did not specifically state Washington could not have committed the crime. Instead, the prosecutor noted that defendant claimed during his interrogation that Washington must have been the shooter. The prosecutor then noted Washington was arrested in River Rouge and was found with two guns. When tested, Grabowski determined the two guns could not have fired the bullets found in Washington's vehicle, or the bullet discovered during Odom's autopsy. The prosecutor argued the "guns don't

match the bullets," and the guns "could not have fired the bullets." This argument was plainly supported by Grabowski's testimony, in which he specifically concluded that the bullets were not fired from Washington's guns. Consequently, this argument did not involve a fact not in evidence, and was therefore proper. *Bahoda*, 448 Mich at 282.

In sum, then, all of defendant's claims of prosecutorial misconduct lack merit for the reasons stated above. Moreover, to the extent there was any minor error committed by the prosecutor, such was cured by the trial court's instructions to the jury before it began deliberating. Specifically, the trial court instructed the jury: "When you discuss the case and decide on your verdict you may only consider the evidence that has been properly admitted in this case." Shortly thereafter, the trial court informed the jury that "[t]he lawyer[s'] statements and arguments are not evidence. They are only meant to help you understand the evidence and each side's legal theories." This Court has held that such an instruction is capable of curing such minor errors related to alleged prosecutorial misconduct. *People v Schrauben*, 314 Mich App 181, 193; 886 NW2d 173 (2016) (holding that reversal was not warranted because "the trial court instructed the jury that the attorneys' statements and arguments were not evidence, and we presume that jurors follow their instructions"). Consequently, to the extent there were any errors committed by the prosecutor, they were cured by the trial court's instructions. *Id*.

## D. INEFFECTIVE ASSISTANCE OF COUNSEL

Finally, defendant argues that defense counsel was constitutionally ineffective at trial. We disagree.

To preserve a claim of ineffective assistance of counsel, a defendant must "move the trial court for a new trial or a *Ginther* hearing," *Jackson*, 313 Mich App at 431, or "by filing in this Court a motion for remand to the trial court for a *Ginther* hearing," *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020) (citation omitted). Defendant did both in this case, as discussed above, and therefore, this argument is preserved for our review. *Id*. Even though defendant preserved this issue by moving the trial court for a new trial or a *Ginther* hearing and moving this Court to remand, "[w]here, as here, there has been no evidentiary hearing on the issue below . . . our review is limited to errors apparent on the record." *People v Seals*, 285 Mich App 1, 19-20; 776 NW2d 314 (2009). Generally, though, "[a] trial court's findings of fact are reviewed for clear error, and whether those facts constitute a violation of the defendant's constitutional right to effective assistance of counsel is a question of law that we review de novo." *Ogilvie*, 341 Mich App at 34 (quotation marks and citation omitted). "Clear error exists when the reviewing court is left with the definite and firm conviction that a mistake has been made." *Davis*, 509 Mich at 68 (quotation marks and citation omitted).

"Criminal defendants have a right to the effective assistance of counsel under the United States and Michigan Constitutions." *Schrauben*, 314 Mich App at 189-190, citing US Const, Am VI; Const 1963, art 1, § 20. "[T]o receive a new trial on the basis of ineffective assistance of counsel, a defendant must establish that 'counsel's representation fell below an objective standard of reasonableness' and that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v Vaughn*, 491 Mich 642, 669; 821 NW2d 288 (2012), quoting *Strickland v Washington*, 466 US 668, 688, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984). "When reviewing defense counsel's performance, the reviewing

court must first objectively 'determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.' " *Jackson*, 313 Mich App at 431, quoting *Strickland*, 466 US at 690. "Next, the defendant must show that trial counsel's deficient performance prejudiced his defense—in other words, that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Jackson*, 313 Mich App at 431, quoting *Vaughn*, 491 Mich at 669.

"This Court will not find trial counsel to be ineffective where an objection would have been futile; nor will it second-guess matters of trial strategy." *Ogilvie*, 341 Mich App at 34. "Because the defendant bears the burden of demonstrating both deficient performance and prejudice, the defendant necessarily bears the burden of establishing the factual predicate for his claim." *People v Muhammad*, 326 Mich App 40, 63; 931 NW2d 20 (2018) (quotation marks and citation omitted).

### 1. FAILURE TO RAISE ISSUES ADDRESSED ABOVE

Defendant argues his counsel was ineffective for failing to raise during trial all of the substantive issues that defendant raised in this appeal above. Specifically, defendant contends that defense counsel should not have approved the jury instructions given during trial and instead should have requested the proposed additional instructions. He also claims defense counsel should have objected to the trial court's and Detective Curry's comments regarding unadmitted evidence, and should have objected to the various instances of prosecutorial misconduct. However, as discussed above, none of the purported errors identified by defendant were actual errors. Consequently, any objections or requests advocated for on appeal would not have been granted during trial. As our Supreme Court has explained, "[d]efense counsel is not ineffective for failing to advance a meritless or frivolous argument." *People v Leffew*, 508 Mich 625, 638; 975 NW2d 896 (2022). As a result, these arguments under the guise of ineffective assistance of counsel fail for the same reasons discussed above. *Id.*

### 2. FAILURE TO REQUEST ADDITIONAL JURY INSTRUCTIONS

Relatedly, defendant argues that defense counsel was ineffective for failing to request jury instructions regarding voluntary and involuntary manslaughter as lesser included offenses of murder, and accident as a defense.[6] As established above, "[a] criminal defendant has the right to

---

[6] The prosecution contends that defendant abandoned these issues on appeal by failing to cite any legal authority. A party abandons a claim on appeal when they elect "simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for [the] claims, or unravel and elaborate for [them their] arguments, and then search for authority either to sustain or reject [their] position." *People v Bass*, 317 Mich App 241, 276; 893 NW2d 140 (2016) (quotation marks and citation omitted). Defendant's brief cited the Model Criminal Jury Instructions he believed should have been read, quoted those instructions, and referenced the testimony he believed supported those instructions. Further, while making the argument in the section of his brief related to ineffective assistance of counsel, defendant incorporated by reference the section of his brief specifically addressing jury instructions. As a result, defendant also cited law related to when certain jury instructions should be given. Consequently, defendant has not abandoned this issue on appeal. *Id.*

have a properly instructed jury consider the evidence against him." *Ogilvie*, 341 Mich App at 34 (quotation marks and citation omitted). "[T]he trial court is required to instruct the jury concerning the law applicable to the case and fully and fairly present the case to the jury in an understandable manner." *Montague*, 338 Mich App at 37 (quotation marks and citation omitted; alteration in original). In other words, "[o]ne of the essential roles of the trial court is to present the case to the jury and to instruct it on the applicable law with instructions that include . . . any material issues, defenses, and theories that are supported by the evidence." *Craft*, 325 Mich App at 606-607 (quotation marks and citation omitted). "Further, when a jury instruction is requested on any theories or defenses and is supported by evidence, it must be given to the jury by the trial judge." *Mills*, 450 Mich at 81 (citation omitted).

As noted, defendant claims defense counsel should have requested jury instructions regarding voluntary and involuntary manslaughter, which are lesser included offenses of murder. Our Supreme Court has explained "that a defendant is entitled to a lesser offense instruction only if that lesser offense is necessarily included in the greater offense[.]" *Jones*, 497 Mich at 164. "Necessarily included lesser offenses are offenses in which the elements of the lesser offense are completely subsumed in the greater offense." *Nickens*, 470 Mich at 626 (quotation marks and citation omitted). As to whether such an instruction should be given, our Supreme Court has stated that "a requested instruction on a necessarily included lesser offense is proper if the charged greater offense requires the jury to find a disputed factual element that is not part of the lesser included offense and a rational view of the evidence would support it." *Cornell*, 466 Mich at 357. "Failure to instruct on a lesser included offense undermines reliability in the verdict only 'when the evidence "clearly" supports the lesser included instruction, but the instruction is not given.' " *Everett*, 318 Mich App at 529, quoting *Cornell*, 466 Mich at 365. "In analyzing whether the evidence 'clearly' supports the instruction, we must consider the 'entire cause,' including evidence that has been offered to support the greater offense." *Everett*, 318 Mich App at 529.

While defendant only references "involuntary manslaughter" generally, he cites to the jury instruction for a violation of MCL 750.329, which states: "A person who wounds, maims, or injures another person by discharging a firearm that is pointed or aimed intentionally but without malice at another person is guilty of manslaughter if the wounds, maiming, or injuries result in death." As explained by our Supreme Court:

> The elements of this offense are: (1) a death, (2) caused by an act of the defendant, (3) resulting from the discharge of a firearm, (4) at the time of the discharge, the defendant was intentionally pointing the firearm at the victim, and (5) the defendant did not have lawful justification or excuse for causing the death. [*Wafer*, 509 Mich at 40.]

Recall that "a defendant is entitled to a lesser offense instruction only if that lesser offense is necessarily included in the greater offense[.]" *Jones*, 497 Mich at 164. Here, our Supreme Court has considered whether involuntary manslaughter under MCL 750.329 is a lesser included offense of murder and concluded it was not. *People v Smith*, 478 Mich 64, 71; 731 NW2d 411 (2007). "Comparing the elements of these offenses, we conclude that statutory involuntary manslaughter under MCL 750.329 is not a necessarily included lesser offense of second-degree murder . . . ." *Id*.

-23-

Because statutory involuntary manslaughter under MCL 750.329 is not a lesser included offense of murder, defendant was not entitled to an instruction regarding it. *Jones*, 497 Mich at 164; *Smith*, 478 Mich at 71. Thus, if defense counsel had requested the instruction, the request would have been denied by the trial court. *Jones*, 497 Mich at 164. Such a request would therefore have been meritless, and trial "counsel is not ineffective for failing to advance a meritless or frivolous argument." *Leffew*, 508 Mich at 638. Consequently, defendant's argument that defense counsel was ineffective for failing to request a jury instruction regarding statutory involuntary manslaughter under MCL 750.329 lacks merit. *Leffew*, 508 Mich at 638.

Defendant also contends that defense counsel should have requested an instruction on voluntary manslaughter as a lesser included offense of murder. Voluntary manslaughter, on the other hand, is a lesser included offense of murder. *Smith*, 478 Mich at 73-74. Therefore, if requested, the instruction had to be given "if the charged greater offense requires the jury to find a disputed factual element that is not part of the lesser included offense and a rational view of the evidence would support it." *Cornell*, 466 Mich at 357. Generally speaking, "[m]anslaughter is murder without malice." *People v Mendoza*, 468 Mich 527, 534; 664 NW2d 685 (2003). "The elements of voluntary manslaughter are: (1) the defendant must kill in the heat of passion, (2) the passion must be caused by an adequate provocation, and (3) there cannot be a lapse of time during which a reasonable person could control his passions." *People v McMullan*, 284 Mich App 149, 156; 771 NW2d 810 (2009).

A request for an instruction on voluntary manslaughter would have been denied because "a rational view of the evidence would" not support there was adequate provocation for defendant to commit murder. *Cornell*, 466 Mich at 357. Roberts, the only person present during the altercation who also provided testimony, claimed the argument between Washington, Roberts, and defendant was about whether they would go to a Coney Island restaurant before going home. According to Roberts, defendant wanted to go to the restaurant, but Roberts did not. Washington agreed with Roberts and began driving home. This caused defendant to become upset, jump out of the vehicle, and fire his gun.

The only other version of events came from defendant during his interrogation. Defendant agreed there was an argument inside Washington's truck before the shooting. Defendant stated he decided to get out of the car after Washington joined in on the argument. Defendant said he could not remember the specifics of his argument with Washington, but defendant remembered he was not kicked out of Washington's truck. Defendant explained he got out of the truck because he did not want to listen to Roberts and Washington argue with him any longer. Defendant claimed that, once outside of the truck, he fired two shots into the air. Defendant insisted he did not fire any bullets at the vehicle.

In his brief on appeal, defendant does not identify what he believes was the "adequate provocation" necessary to reduce his charge from murder to voluntary manslaughter. *McMullan*, 284 Mich App at 156. "The provocation necessary to mitigate a homicide from murder to manslaughter is that which causes the defendant to act out of passion rather than reason." *People v Sullivan*, 231 Mich App 510, 518; 586 NW2d 578 (1998), aff'd 461 Mich 992 (2000). "Case law has consistently held that the provocation must be adequate, namely, that which would cause a reasonable person to lose control." *Id*. Assuming defendant is relying on the argument occurring in Washington's truck before the murder, his claim lacks merit. Defendant has not cited any

caselaw, nor is there any, suggesting an argument about going to a restaurant or whether a boyfriend told his girlfriend he would have his friend slap her is adequate provocation under the relevant law. *Id*. While defendant told police that Washington was waving a gun around, defendant never stated he feared Washington or was in some way provoked by Washington having a gun. Defendant certainly has not identified this as an adequate provocation in his brief on appeal. As this Court has explained, a trial court is not required to give a voluntary-manslaughter instruction if "no reasonable jury could find that the provocation was adequate . . . ." *Id*. at 518-519. Because "a rational view of the evidence" did not support defendant committed voluntary manslaughter, any request for an instruction regarding the lesser included offense would have been denied. *Cornell*, 466 Mich at 357; *Sullivan*, 231 Mich App at 518. Therefore, if defense counsel had requested the instruction as defendant claims should have occurred, the request would have been meritless, and trial "counsel is not ineffective for failing to advance a meritless or frivolous argument." *Leffew*, 508 Mich at 638.

Next, defendant argues defense counsel was ineffective for failing to request an instruction regarding accident as a defense. When discussing accident as a defense, this Court provided the following definition:

> a fortuitous circumstance, event or happening; an event happening without any human agency, or if happening wholly or partly through human agency, an event which under the circumstances is unusual and unexpected by the person to whom it happens; an unusual, fortuitous, unexpected, unforeseen or unlooked for event, happening or occurrence; an unusual or unexpected result attending the operation or performance of a usual or necessary act or event; chance or contingency; fortune; mishap; some sudden and unexpected event taking place without expectation, upon the instant, rather than something which continues, progresses or develops; something happening by chance; something unforeseen, unexpected, unusual, extraordinary or phenomenal, taking place not according to the usual course of things or events, out of the range of ordinary calculations; that which exists or occurs abnormally, or an uncommon occurrence. [*People v Hess*, 214 Mich App 33, 37; 543 NW2d 332 (1995), quoting *People v Freeman*, 432 Mich 656, 669 n 8; 443 NW2d 734 (1989).]

Defendant claims defense counsel should have requested M Crim JI 7.2, which is titled "Murder: Defense of Accident (Not Knowing Consequences of Act)," and states:

> (1) The defendant says that [he/she] is not guilty of _____ because _____'s death was accidental. By this defendant means that [he/she] did not mean to kill or did not realize that what [he/she] did would probably cause a death or cause great bodily harm.

> (2) If the defendant did not mean to kill, or did not realize that what [he/she] did would probably cause a death or cause great bodily harm, then [he/she] is not guilty of murder.

The record contained minimal evidence that defendant killed Odom by accident. Pertinently, during his interrogation, defendant claimed he fired his gun into the air when he exited

Washington's truck. While the jury had good reason to disbelieve this claim, the most notable of which was the angle the bullet must have taken to break the rear window of the pickup truck and strike Odom in the head, it was still plausible. However, just because an instruction would have been given if requested does not necessarily indicate defense counsel was ineffective. *Strickland*, 466 US at 688, 694.

Assuming that defense counsel should have requested the instruction, defendant's claim still fails under the second prong of *Strickland*. Recall that the second prong requires defendant to "show that trial counsel's deficient performance prejudiced his defense—in other words, that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Jackson*, 313 Mich App at 431, quoting *Vaughn*, 491 Mich at 669. Defendant does not provide any specific arguments regarding why he believes an instruction regarding accident would have changed the outcome of his trial as related to the murder charge.

Moreover, considering the elements of first-degree premeditated and second-degree murder, the jury's decision to convict defendant of second-degree murder specifically rules out the possibility the jury would have believed the accident defense. For the accident defense to have succeeded, the jury would have to believe defendant "did not mean to kill or did not realize that what [he] did would probably cause a death or cause great bodily harm." M Crim JI 7.2(1). The trial court instructed the jury regarding the elements of first-degree premeditated murder and the lesser included offense of second-degree murder. As noted above, the elements of first-degree premeditated murder "are (1) the intentional killing of a human (2) with premeditation and deliberation." *Oros*, 502 Mich at 240 (quotation marks and citation omitted). On the other hand, "[t]he elements of second-degree murder are (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse." *Wafer*, 509 Mich at 40 (quotation marks and citation omitted). "Malice is defined as the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *Baskerville*, 333 Mich App at 284 (quotation marks and citation omitted).

The jury was instructed that it had to determine beyond a reasonable doubt defendant either intended to kill, intended to cause great bodily harm, or intended to "do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *Baskerville*, 333 Mich App at 284. In *People v Hawthorne*, 474 Mich 174, 184-185; 713 NW2d 724 (2006), our Supreme Court considered a murder case involving a claim the trial court should have instructed the jury regarding accident as a defense. Notably, as in the present case, the jury in *Hawthorne* convicted the defendant of second-degree murder. *Id*. at 185. After determining that the accident instruction should have been given, the Court reasoned reversal was unwarranted because "the jury instructions explaining the intent element of murder made it clear that a finding of accident would be inconsistent with a finding that defendant possessed the intent required for murder." *Id*. (quotation marks, citation, and alterations omitted). The Court noted that if the jury believed the defendant's action was an accident, it would not have convicted the defendant of second-degree murder. *Id*. In *Hawthorne*, 474 Mich at 185, the jury could have convicted the defendant of involuntary manslaughter, but chose second-degree murder.

The same is true in the present case. The jury was well aware that they had to determine that defendant had a specific intent when firing the gun to convict him of second-degree murder. *Baskerville*, 333 Mich App at 284. None of those options were consistent with defendant's actions being an accident. *Hawthorne*, 474 Mich at 185; *Baskerville*, 333 Mich App at 284. Moreover, given the prosecution's reliance on transferred intent and charging defendant with AWIM related to Roberts and Washington, the jury told us three separate times their decision regarding defendant's intent. Specifically, the jury concluded defendant intended to kill someone when he fired the gun. If the jury determined the death was an accident, it would not have convicted defendant of second-degree murder. *Hawthorne*, 474 Mich at 185. Consequently, even if defense counsel had requested the jury instruction about accident as a defense to murder and the trial court gave it, there is no reasonable likelihood the outcome of trial would have been different. *Id*. Therefore, defense counsel was not ineffective. *Vaughn*, 491 Mich at 669.

### 3. STIPULATION TO DISMISS JUROR

Defendant argues defense counsel was ineffective for refusing to agree with the prosecution to dismiss a juror the prosecution believed was sleeping through portions of the trial. However, it was not objectively unreasonable for defense counsel to permit the potentially sleeping juror to remain on the jury. When considering a claim of a juror sleeping during trial, this Court analyzes whether juror misconduct occurred. *People v Dunigan*, 299 Mich App 579, 586; 831 NW2d 243 (2013). In *Dunigan*, this Court noted that even if the alleged misconduct "did actually occur, [it] will not warrant a new trial unless the party seeking the new trial can show that the misconduct [was] such as to affect the impartiality of the jury or disqualify them from exercising the powers of reason and judgment." *Id*. (quotation marks and citation omitted). When specifically analyzing the issue of a sleeping juror with respect to ineffective assistance of counsel, the *Dunigan* Court noted that "defense counsel could reasonably have made a strategic decision to assume that the juror's missing that testimony would have helped the defense." *Id*. at 586-587. Moreover, when there was only a single juror identified who was sleeping and defendant failed to identify the missed testimony, this Court concluded the defendant failed to prove the sleeping juror remaining on the jury was reasonably likely to have changed the outcome of trial. *Id*.

This Court's published opinion in *Dunigan* is binding and determinative in this case. It is important to note that, because there was no *Ginther* hearing granted in this case, our "review is limited to errors apparent on the record." *Seals*, 285 Mich App at 19-20. The record shows that the prosecution thought one juror might have been sleeping during portions of the trial. The prosecution sought to place a stipulation on the record to have the juror in question named the alternate at the end of trial. Defendant's trial counsel disagreed a juror was sleeping, and refused to stipulate as requested. As noted by this Court in *Dunigan*, 299 Mich App at 586-587, this could have been a strategic decision by defense counsel. After all, defendant did not present any testimony or witnesses during the trial, so any testimony missed by a sleeping juror was inculpatory evidence from a prosecution witness. Defense counsel could have determined it was beneficial if one juror may have missed a particularly inculpatory piece of evidence. We will not "second-guess matters of trial strategy." *Ogilvie*, 341 Mich App at 34. Thus, defendant has failed to show defense counsel acted in an objectively unreasonable manner by allowing the allegedly sleeping juror to remain on the jury. *Id*.

Further, under the second prong of *Strickland*, defendant cannot show the outcome of trial would have been different if defense counsel had sought to remove the juror at issue. As noted in *Dunigan*, 299 Mich App at 586, a defendant who can only identify one juror who slept through a portion of trial, but not the evidence that juror missed, has failed to prove the second prong of *Strickland*. Here, defendant has done the exact same thing as the defendant in *Dunigan*. The record provides no indication when exactly the juror in question allegedly was sleeping. Further, the record does not suggest what evidence or testimony was admitted during the time when the juror was purportedly sleeping. "Because the defendant bears the burden of demonstrating both deficient performance and prejudice, the defendant necessarily bears the burden of establishing the factual predicate for his claim." *Muhammad*, 326 Mich App at 63 (quotation marks and citation omitted). Defendant has failed to do so in this case, which defeats his claim of ineffective assistance of counsel. *Id*.

## 4. REMAND FOR *GINTHER* HEARING

At the end of his brief, defendant suggests we should remand for a *Ginther* hearing if we determine the factual record needs to be further developed. In so arguing, defendant does not identify any factual issues requiring development during an evidentiary hearing held according to *Ginther*. In *People v Williams*, 275 Mich App 194, 200; 737 NW2d 797 (2007), this Court denied a request to remand for a *Ginther* hearing "[b]ecause defendant has not set forth any additional facts that would require development of a record to determine if defense counsel was ineffective . . . ." Defendant has not suggested any reason why the same result should not be reached in the present case, considering he has similarly failed to identify a relevant factual inquiry requiring a hearing. *Williams*, 275 Mich App at 200.

## III. CONCLUSION

For the reasons explained above, defendant's allegations of error warranting reversal of his convictions and remand for a new trial lack merit. Consequently, we affirm.

/s/ James Robert Redford
/s/ Kirsten Frank Kelly
/s/ Michelle M. Rick